**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MINNESOTA**

---

In re:   Creative Stars Academy, LLC,

Debtor.

Case No. 25-33151

Chapter 7

---

**NOTICE OF HEARING AND**
**MOTION FOR**
**RELIEF FROM AUTOMATIC STAY**

---

TO: The Debtor and other entities specified in Local Rule 9013-3

**Raimann Farms, LLC** ("Movant" or "Landlord") moves the Court for the relief requested below and gives of hearing.

1.      The Court will hold a hearing on the Motion at 1:30 p.m. on March 5, 2026, before the Honorable Mychal A. Bruggeman. The hearing will be held remotely via Webex video, using the following link:

https://us-courts.webex.com/us-courts/j.php?MTID=m594b0fb9729997da1232f37f296571ef

If you have questions concerning the court's Webex system, please contact Judge Bruggeman's Courtroom Deputy by email at mnb_bruggeman_hearings@mnb.uscourts.gov or by telephone at (651) 848-1051.

2.      Any response to the Motin must be filed and served no later than Saturday, February 28, 2026, which is five days before the time set for the hearing (including Saturdays, Sundays and holidays). UNLESS A RESPONSE OPPOSING THIS MOTION IS TIMELY FILED, THE COURT MAY GRANT THIS MOTION WITHOUT A HEARING.

3. This Court has jurisdiction over this Motion pursuant to Sections 157 and 1334 of Title 28 of the United States Code, rule 5005 of the Federal Rules of Bankruptcy Procedure, and Local Rule 1070-1. The proceeding is a core proceeding. Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code in this Court, Case No. 25-33151. February 5, 2026, this Court entered an Order Converting the case from Chapter 11 to Chapter 7, finding that the Debtor had ceased all business activities, failed to pay post-petition taxes, failed to file monthly reports after November 2025, and was no longer pursuing rehabilitation. A true and correct copy of the Order Converting to Chapter 7 is attached hereto as Exhibit A.

4. This Motion arises under Section 362(d) of the United States Bankruptcy Code (11 U.S.C. §362(d)), Rule 4001(a) of the Federal Rules of Bankruptcy Procedure, and Local Rule 4001-1(a). This Motion is filed under Rule 9014 of the Federal Rules of Bankruptcy Procedure and Local Rules 9013-1, 9013-2, and 9013-3.

## BACKGROUND

1. On or about September 8, 2022, A.C.S. of Kasson LLC assigned its interest as landlord under a commercial lease with Creative Stars Academy, LLC to Raimann Farms, LLC pursuant to an Assignment of Leases. A true and correct copy of the Assignment of Leases is attached hereto as Exhibit B.

2. The underlying Lease, dated October 1, 2022, is between A.C.S. of Kasson LLC (as original Landlord) and Creative Stars Academy and Learning Center (as Tenant) for a Day Care facility located at 301 Mantorville Avenue South, Unit/Suite 400, Kasson, MN 55944 (the "Premises"). A true and correct copy of the Lease is attached hereto as Exhibit C.

3. Under Section 6.2 of the Lease, the Landlord has the right to sell or convey the Premises subject to the Lease or to assign its rights, title, and interest as Landlord under the Lease.

The assignment from A.C.S. of Kasson LLC to Raimann Farms, LLC was made pursuant to this provision.

4.  Under the Lease, the Debtor is obligated to pay monthly Base Rent of $6,800.00 plus Operating Costs, including a monthly real estate tax payment of $1,983.00 and its Pro Rata Share (19%) of Common Area Expenses.

7.  The Debtor owes rent for February 2026. The Debtor's monthly rental obligation, including base rent and the monthly tax payment, totals $9,912.05.

8.  The Order Converting to Chapter 7 notes that the Debtor reported having no remaining cash and had overdrawn its accounts, and that unpaid post-petition rents totaled $15,500.

9.  The Debtor has ceased all business operations and is no longer operating at or occupying the Premises for the purpose specified in the Lease. The principal of Debtor, Jill Mertens, is still occupying the space and may still be operating a childcare center under a different legal entity "Creative Stars Academy Childcare and Learning Center II LLC."

**LEGAL ARGUMENT**

10.  Pursuant to 11 U.S.C. § 362(d)(1), the Court shall grant relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." The Debtor's failure to pay post-petition rent constitutes "cause" for relief from the stay.

11.  Alternatively, under 11 U.S.C. § 362(d)(2), relief from the stay is appropriate where the debtor does not have equity in the property and the property is not necessary to an effective reorganization. This case has been converted to Chapter 7, making reorganization impossible. The Debtor has no equity interest in the leasehold, and the Premises are not necessary for any reorganization.

12. The estate suffers continuing, uncompensated post-petition losses to the Movant in the form of unpaid rent. The Debtor has no ability to cure the defaults or make future payments. The Debtor has ceased operations and has no remaining assets with which to satisfy its ongoing rental obligations.

13. Movant seeks relief from the automatic stay for the limited purpose of commencing and prosecuting an eviction action against the Debtor in the appropriate state court in Dodge County, Minnesota, to recover possession of the Premises.

### RELIEF REQUESTED

WHEREFORE, Movant Raimann Farms, LLC respectfully requests that this Court enter an order:

a. Granting relief from the automatic stay imposed by 11 U.S.C. § 362(a) to permit Movant to commence and prosecute an eviction action against the Debtor in the appropriate state court in Dodge County, Minnesota;

b. Granting relief from the automatic stay to permit Movant to exercise all rights and remedies available under the Lease and applicable state law, including but not limited to termination of the Lease and recovery of possession of the Premises;

c. Waiving the fourteen (14) day stay of Fed. R. Bankr. P. 4001(a)(3); and

d. Granting such other and further relief as this Court deems just and equitable.

Dated: February 17, 2026

DUNLAP & SEEGER, P.A.

By: s/ Benjamin S. King
Benjamin S. King
Attorney License No. 0395466
Attorneys for Raimann Farms, LLC
30 Third Street SE, Suite 400
Post Office Box 549
Rochester, Minnesota 55903
Telephone No. (507) 288-9111

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:                                                        Case No. 25-33151

Creative Stars Academy, LLC,

Debtor.                                               Chapter 11, Sub V

**ORDER CONVERTING CASE TO CHAPTER 7**

Before the court is a motion to dismiss by the United States Trustee. The debtor filed a notice of no objection to the motion, along with a status report stating that it had ceased all business activities and will not propose a plan of reorganization.

At the initial hearing on January 21, 2026, the Court found that cause existed under 11 U.S.C. § 1112(b)(4) to convert or dismiss the case. Specifically, the Debtor failed to pay post-petition taxes, failed to file any monthly reports after November, 2025, incurred a substantial loss and diminution of the estate, and no longer pursued rehabilitation.

Upon finding cause to discontinue the case in chapter 11, Section 1112(b)(1) additionally requires the Court to decide whether to convert or dismiss the case, whichever is in the best interests of the creditors and the estate. No creditors have appeared in the action stating a preference for either conversion or dismissal.

It was not clear at the hearing what assets remained in the estate, and the Court requested the Debtor to file a report as to its remaining assets and unpaid claims that arose post-petition. The Court further noted that the Debtor scheduled several 90-day preference claims totaling $86,943.73, against three entities that also appear to be merchant cash advance lenders (MCAs) from New York and Connecticut. These preference claims are not subject to pre-petition security

1

EXHIBIT A

interests and the Court previously ordered that they were not subject to replacement liens granted as part of prior cash collateral orders. *See* Doc. No. 16, 25 and 40.

The Debtor filed this report on January 26, 2026, indicating that it had no remaining cash, and had, in fact, overdrawn its accounts. The report also notes that there is unpaid post-petition payroll of $6,200, unpaid post-petition rents of $15,500, and post-petition professional fees, including subchapter V trustee fees, exceeding $10,000.

The report further argues that the costs of pursuing preferences and the potential defenses make it unlikely that a chapter 7 trustee could produce a net recovery above post-conversion administrative expenses. The Debtor further argues that payments to creditors occurred according to contractual terms, thus, providing in its view a strong ordinary course of business defense. Notwithstanding such circumstances, the Court is aware that chapter 7 trustees have settled and recovered avoidance claims against MCAs through litigation.

The Court reconvened the hearing on February 3, 2026. The UST maintained that dismissal likely remained the best outcome for creditors, but that conversion would not overly burden a trustee, who could promptly determine whether pursuing the preferences would benefit the estate.

Based on the record, the Court finds that conversion to chapter 7 will best serve the interests of the creditors and the estate. Given that the Debtor appears to lack any remaining assets, the Court does not believe that any creditors, including those that asserted security interests in the Debtor's prepetition property, would now recover anything from the Debtor outside of bankruptcy.

In addition, the 90-day preference claims are not recoverable outside of bankruptcy. It is at least conceivable that a chapter 7 trustee could successfully pursue these claims for a net recovery. The trustee can further review the Debtor's financial activity, which is a concern the Court raises since the Debtor has not filed any monthly reports and transaction histories since November, 2025.

2

The Court believes that the trustees in this district have the necessary experience and skill to quickly decide whether to pursue claims or to promptly seek closure of the case if the burdens of administering the case would exceed any likely recovery.

Thus, in weighing the benefit to creditors, conversion is more likely to provide recovery to creditors, and the Court finds conversion is in the best interests of the creditors.

IT IS ORDERED

1. This case shall be converted to chapter 7.


Dated:  *February 5, 2026*

s/ Mychal A. Bruggeman

Mychal A. Bruggeman
United States Bankruptcy Judge

## ASSIGNMENT OF LEASES

**THIS ASSIGNMENT OF LEASES** made this 8th day of September, 2022, by and between A.C.S. of Kasson LLC, a Minnesota Limited Liability Company (hereinafter "Assignor"), to Raimann Farms, LLC (hereinafter "Assignee").

**WHEREAS,** Assignor, as the Landlord, entered into certain leases, hereinafter the "Leases," with regard to property located in Dodge County, Minnesota, legally described as follows:

See Exhibit A attached, (hereinafter the "Premises"); and

**WHEREAS,** Assignor desires to assign all of their rights, title and interest under the Leases to Assignee in accordance with the terms hereof.

**NOW, THEREFORE,** in consideration of One ($1.00) Dollar and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor agrees as follows:

1.  Assignor hereby assigns, sets over and transfers to Assignee, all of Assignor's rights, title and interest, as Landlord, under each of the Leases listed on Exhibit B attached hereto, together with all rentals, all escalation payments, and all security deposits and guaranties.

2.  Assignor hereby warrants that, to their knowledge, there are no actions, suits or proceedings which have been filed in any court against Assignor which are the subject of such Leases, and Assignor hereby represents that they have not received any prepaid rents for any future period.

**IN WITNESS WHEREOF,** Assignor has hereunto set their hands the day and year first above written.

A.C.S. of Kasson LLC

BY:_____

EXHIBIT B

STATE OF MINNESOTA                          )
                                            ) ss.
COUNTY OF OLMSTED                           )

The foregoing instrument was acknowledged before me this 8th day of September, 2022, by Brad Clemens.

_____
Notary Public



VIRGINIA WILSON
NOTARY PUBLIC - MINNESOTA
My Comm. Exp. Jan. 31, 2025

## CONSENT OF ASSIGNEE

Raimann Farms, LLC, hereby accepts this Assignment of Leases and assumes the benefits, liabilities and obligations of Assignor under such Leases.

Dated:  September 8, 2022.

Raimann Farms, LLC

By

**This Instrument Was Drafted By:**
**Dunlap & Seeger, P.A.**
**30 3rd Street SE, Suite 400**
**Rochester, MN  55904**

**Telephone:  (507) 288-9111**

## EXHIBIT A

### Legal Description of Property ("Premises")

Parcel 1:  Lot 1, Block 1, SHOPKO ADDITION, according to the recorded plat thereof, Dodge County, Minnesota.

Parcel 2:  Outlot A, SHOPKO ADDITION, according to the recorded plat thereof, Dodge County, Minnesota, except:

That part of Outlot A, Shopko Addition, according to the plat thereof on file at the County Recorder's Office, Dodge County, Minnesota, described as follows:

Beginning at the southeast corner of said Outlot A; thence North 00 degrees 23 minutes 41 seconds East, (assumed bearing), along the east line of said Outlot A, 36.33 feet; thence South 89 degrees 53 minutes 48 seconds West, 120.22 feet; thence southwesterly 7.4 feet, more or less, along a tangential curve, concave southerly, having a central angle of 47 degrees 05 minutes 29 seconds, and a radius of 9.00 feet to the northerly extension of the west line of Outlot B of said Shopko Addition; thence South along said northerly extension to the northwest corner of said Outlot B and the south line of said Outlot A; thence East along the south line of said Outlot A to the POINT OF BEGINNING

# EXHIBIT B

**Leases**

LEASE

THIS LEASE is made and entered into effective October 1, 2022 (the "Effective Date"), by and between A.C.S. OF KASSON LLC, a Minnesota limited liability company ("Landlord"), and Creative Stars Academy and Learning Center, a Minnesota limited liability company ("Tenant"). For and in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto do hereby mutually agree as follows:

SECTION 1.      THE PREMISES, SITE, COMMON AREAS.

**1.1** *Premises.* Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, for the term and upon the conditions hereinafter provided, the Day Care facility located at 301 Mantorville Avenue South, Unit/Suite 400, Kasson, MN 55944 (the "Premises").

**1.2** *Site.* The Premises described together with the common areas and other appurtenances are depicted on Exhibit A (the "Site").

**1.3** *Common Areas.* Tenant shall have the non-exclusive right to use in common with other tenants and/or occupants of the Site, the following areas appurtenant to the Premises: parking areas and facilities, roadways, sidewalks, walkways, parkways, plazas, driveways and landscaped areas and similar areas and facilities situated within the exterior areas of the Site and not otherwise designated for the exclusive or restricted use by Landlord and/or individual tenants of other buildings located within the Site (the "Common Areas"). All Common Areas shall be subject to Landlord's sole management and control and shall be operated and maintained in such manner as Landlord, in its reasonable discretion, shall determine.

SECTION 2.      TERM.

**2.1** *Initial Term.* The initial term of this Lease shall commence on the Effective Date first set forth above and expires at midnight on the last day of the sixtieth (60th) full calendar month thereafter (the "Initial Term").

**2.2** *Extended Term.* Notwithstanding the expiration of the Initial Term, so long as Tenant is not in default of its obligations under this Lease, Tenant has the option to extend the Term on all the provisions contained in this Lease, except for Base Rent (as hereinafter defined), for additional three (5) year periods (each, an "Extended Term") following the expiration of the Initial Term or the previous Extended Term (each, a "Previous Term"), by executing the applicable option agreement prior to the expiration of the Previous Term as provided on Schedule A attached hereto; provided that, (i) Landlord, in its sole discretion, shall determine the applicable Rent for each Extended Term, and (ii) Tenant's execution of the stated new Rent shall be evidenced by its signature on Schedule A attached hereto. If Tenant appropriately exercises its option to extend, the Extended Term will commence on the first day following the expiration of the Previous Term.  As used herein the "Term" shall mean the Initial Term and any Extended Term, as applicable.

SECTION 3.      RENT.

**3.1** *Base Rent.* For purposes hereof, a "Lease Year" commences on October 1,2022 and terminates at the end of the sixtieth (60th) month following thereafter.  During the first Lease term (commencing October 1, 2022 and ending September 30, 2027), Tenant shall pay as "Base Rent" for the Premises per the following schedule:

Months 1,2,3 (October 2022, November 2022, December 2022).  30% rent $2040 plus full Operating cost.
Months 4,5,6,(January 2023, February 2023, March 2023).  50% rent $3400 plus full Operating cost.
Months 7,8,9 (April 2023, May 2023, June 2023).  80% rent $5440 plus full Operating cost.
Months 10-60 (July 2023 through September 2027).  100% rent $6800 plus full Operating cost.

During each Extended Term, the Base Rent shall be agreed upon by Landlord and Tenant and set forth on Schedule A attached hereto.

**3.2** *Additional Rent.* As additional consideration for this Lease, Tenant shall, for the Term of this Lease, and without any set-off or deduction therefrom, pay directly, before delinquency, the following ("Additional Rent" and together with Base Rent, collectively referred to herein as "Rent"):

(a) *Operating Costs.* Tenant shall pay all costs of maintaining and operating the Premises, and Landlord's costs of owning the Premises and its Pro Rata Share of Common Area Expenses. Said costs shall be referred to herein as "Operating Costs" and are hereby defined to include but not be limited to, all real estate taxes and assessments on the Premises, heat, cooling, utilities, insurance, security, all taxes and other governmental impositions, including but not limited to gross receipts taxes and taxes on rentals relating to the Premises, all maintenance and repair expenses, whether or not said maintenance or repair expenses may be capitalized for federal income tax purposes, any equipment rental and any and all other costs of operation, whether ordinary or extraordinary, all costs to supervise and administer the Site and the Common Areas, including wages and benefits payable to employees of Landlord whose duties are directly, but only to such extent, connected with the operation and maintenance of the Site, and such management fees as may be paid to the property manager (which may be an entity related to Landlord).

"Common Area Expenses" means all costs to operate, maintain, repair, replace, supervise, insure and administer the Common Areas, including supplies, materials, labor and equipment used in or related to the operation and maintenance of the Common Areas, including parking areas (including, without limitation, all costs of resurfacing and restriping parking areas), signs and directories on the Site, landscaping (including maintenance contracts and fees payable to landscaping consultants), amenities, sprinkler systems, sidewalks, walkways, driveways, curbs, lighting systems and security services, if any, provided by Landlord for the Common Areas.

Tenant's "Pro Rata Share" is 19%. Year 1 ending September 30, 2022 will be capped at a Maximum price of $3.50/SF

The "Rentable Area" of the Premises is 6800 square feet.

(b) *Taxes.* Notwithstanding the foregoing provisions of this Section 3.2, Landlord shall submit to the Dodge County Auditor/Treasurer's office any real estate and assessment payment for the Site. On a monthly basis, on the first day of each and every calendar month during the Term hereof, Tenant shall pay to Landlord $1,983.00 of Tenant's Pro Rata Share of the real estate taxes, special assessments and any other taxes that may be imposed in lieu of or partially in lieu of general real estate taxes applicable to the Site. Tenant shall pay such taxes and assessments to Landlord based upon the earliest available estimate of annual real estate taxes and assessments from the Dodge County office of property records and licensing.  In the event such estimated payments create a surplus or overage, Landlord shall retain such overage and shall apply all amounts therefrom against later accruing taxes and assessments.

(c) *Insurance.* Notwithstanding the forgoing provisions of this Section 3.2, Landlord

2

shall pay for the insurance for the Premises. On a monthly basis, on the first day of each and every calendar month during the Term hereof, Tenant shall pay to Landlord $0 (included above) of Tenant's Pro Rata Share of the insurance for the Site.

**3.3** *Rent Net of All Costs.* It is the purpose and intent of Landlord and Tenant that Base Rent payable by Tenant hereunder shall be absolutely net to Landlord, so that this Lease shall yield, net to Landlord, Base Rent in each year during the Term, and that all costs, fees, expenses, interest (other than mortgage interest, if any), charges, reimbursements and obligations of every kind and nature whatsoever relating to the Premises (except those expressly stated in this Lease to be obligations of Landlord, if any), which may arise or become due during the Term shall be paid or discharged by Tenant as Additional Rent hereunder, whether or not specifically designated as such, and Tenant agrees to indemnify and hold Landlord harmless from and against such costs, fees, interest, charges, expenses, reimbursements and obligations, and interest thereon.

**3.4** *Manner of Payment.* Rent shall be payable in monthly installments (or more frequently as Landlord and Tenant may mutually agree) on or before the last day of each Lease month. Tenant will pay Rent, together with all other amounts due hereunder, to Landlord at such address as Landlord may designate from time-to-time, without demand and without deduction, setoff or counterclaim.

**SECTION 4.**   **USE.**   Tenant shall use the Premises as an Daycare facility and Learning Center. Tenant shall not convert the Premises to an alternative use during the Term. Tenant will not use or occupy the Premises for any unlawful purpose, and will comply with all present and future laws, ordinances, regulations and orders of the United States of America, the State of Minnesota and all other governmental units having jurisdiction over the Premises.

**SECTION 5.**   **INDEMNITY.** Landlord (including Landlord's agents, successors and assigns) shall not be liable to Tenant, or those claiming through or under Tenant, for any injury, death or property damage occurring in, on or about the Premises, and Tenant shall indemnify Landlord and hold Landlord harmless from any claim or damage arising out of any injury, death or property damage occurring in, on or about the Premises to Tenant or to any employee, customer or invitee of Tenant except for liability arising out of the negligence of Landlord or Landlord's agent.

**SECTION 6.**   **ASSIGNMENT AND SUBLETTING.**

**6.1** *Tenant Assignments and Subletting.* Tenant will not assign, transfer, mortgage or encumber this Lease or sublet or rent or permit occupancy or use of the Premises, or any part thereof by any third party, without obtaining the prior written consent of Landlord.

**6.2** *Landlord's Right to Sell or Assign.* Landlord shall have the right to sell or convey the Premises subject to this Lease or to assign its right, title and interest as Landlord under this Lease in whole or in part. In the event of any such sale or assignment other than a security assignment, Landlord shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Landlord contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

**SECTION 7.**   **REPAIRS AND MAINTENANCE.** Tenant at its sole cost will keep the Premises in good, clean, safe and sanitary condition, will take good care thereof, will suffer no waste or injury thereto, and will, at the expiration or other termination of the term of this Lease, surrender the same empty, cleaned and in the same order and condition in which they are on the Effective Date. Tenant at its sole cost shall make all necessary repairs to the Premises, window panes, including plate glass, if any, and including repairs to and, if Landlord deems it reasonably necessary prior to the end of the Term, replacement of the roof.

3

Landlord will make all necessary repairs to the structural components of the Premises. Landlord shall pay all expenses for maintaining, repairing, and if necessary, replacing the plumbing, sewage, heating, air conditioning, electrical and ventilating systems in order to maintain said systems in good repair.

**SECTION 8.    RIGHT OF ENTRY.** Tenant will permit Landlord, or Landlord's agent or representative, to enter the Premises to examine, inspect and protect the same, and to make such alterations and/or repairs as in the judgment of Landlord may be deemed necessary for the Premises, or to exhibit the same to prospective tenants.

**SECTION 9.    INSURANCE RATING.** Tenant will not conduct or permit to be conducted any activity, or place any equipment in or about the Premises, which will in any way increase the rate of fire insurance or other insurance on the Premises.

**SECTION 10.    SERVICES AND UTILITIES.** For the entire term of this Lease, and to the extent such services are separately provided to the Premises, Tenant shall make all arrangements, and shall pay directly before delinquency, for all utilities and services furnished to or used by it, including, without limitation, gas, electricity, water, sewer, telephone service, and trash collection and for all connection charges.

**SECTION 12.    FIRE AND CASUALTY.** If, during the Term of this Lease, the Premises or the building in which the Premises are located are totally or partially destroyed, rendering the Premises totally or partially inaccessible or unusable, Landlord shall, in Landlord's sole judgment, determine whether to repair, replace, or restore said Premises or the building in which the Premises are located, or terminate this Lease. Landlord shall provide Tenant with notice of Landlord's determination to restore the Premises or the building in which the Premises are located or to terminate the Lease within thirty (30) days of the total or partial destruction of the Premises or the building in which the Premises are located. If the Premises or the building in which the Premises are located are totally destroyed and Landlord elects to restore the Premises, then this Lease shall not terminate, but Tenant shall be entitled to a total abatement of rent during said period of restoration. If Landlord fails to substantially complete restoration within one hundred eighty (180) days after the Premises or the building in which the Premises are located are totally destroyed, Tenant may, at Tenant's option upon thirty (30) days written notice to Landlord, terminate this Lease. If the Premises or the building in which the Premises are located is partially destroyed or damaged, and if Landlord has elected to repair the Premises, then this Lease shall not terminate, and Tenant shall remain responsible for rent hereunder, except that said rent shall be reduced based upon the extent to which the damage or destruction interferes with Tenant's use of the Premises, until such time as Landlord has completed repairs to the Premises or the building in which the Premises are located.

**SECTION 12.    DEFAULT AND REMEDIES.**

**12.1    *Defaults.*** Each of the following shall be deemed a breach of this Lease and a default by Tenant: (a) Tenant shall fail to pay any monthly installment of Rent; (b) Tenant shall fail to pay when due any amounts owing to Landlord by Tenant, whether or not such obligation arises under this Lease; (c) Tenant becomes insolvent, performs any act of bankruptcy or is not generally paying its debts within reasonably accepted business standards; and (d) Tenant shall violate or fail to perform any of the conditions, covenants, or agreements herein made by Tenant, or shall violate or fail to obey any reasonable rules from time to time promulgated by Landlord if not cured within thirty (30) days after written notice thereof is given by Landlord.

**12.2    *Remedies.*** (a)    In the event of any breach or default, and without any notice, except, if applicable, such notice as may be required by law and cannot be waived by Tenant (all other notices being hereby waived), Landlord shall be entitled to exercise, at Landlord's option, concurrently, successively or in any combination, all remedies available at law or in equity, including without limitation any one or more

4

of the following: (i) Landlord may terminate this Lease; (ii) Landlord may reenter and take possession of the Premises or any part thereof (which reentry shall not operate to terminate this Lease unless Landlord expressly so elects), after appropriate legal process; (iii) Landlord may relet the Premises or any part thereof for such term or terms (including a term which extends beyond the original term of this Lease), at such rentals and upon such other terms as Landlord, in Landlord's sole discretion, may determine, with all proceeds received from such reletting being applied to the rentals and other sums due from Tenant in such order as Landlord may, in its sole discretion, determine, with Tenant remaining liable for any deficiency; (iv) Landlord may accelerate and recover from Tenant an amount equal to Rent to be received from Tenant under this Lease from the date of such breach to the expiration of the then-current term; and/or (v) Landlord may recover from Tenant all expenses, including attorneys' fees, marketing expenses and leasing commissions, and cost of alterations occasioned by a breach by Tenant of this Lease, reasonably paid or incurred by Landlord as a result of such breach.

(b)      In addition, in the event of any breach or default by Tenant, Landlord may, but shall not be obligated to, immediately or at any time thereafter, and without notice, except as required herein, correct such breach or default without, however, curing the same for the account and at the expense of Tenant.

(c)      The commencement and prosecution of one action shall not be deemed a waiver from commencing one or more actions from time to time in the future. All rights and remedies of Landlord under this Lease shall be cumulative and shall not be exclusive of any other rights and remedies provided to Landlord under applicable law.

SECTION 13.    WAIVER. No waiver by Landlord of any breach of any covenant, condition or agreement herein contained shall operate as a waiver of such covenant, condition or agreement itself, or of any subsequent breach thereof.

SECTION 14.    COVENANTS OF LANDLORD. If Tenant shall pay the rental and perform all of the covenants, terms and conditions of this Lease to be performed by Tenant, Tenant shall, during the term hereby created, freely, peaceably and quietly occupy and enjoy the full possession of the Premises without molestation or hindrance by Landlord or any party claiming through or under Landlord.

SECTION 15.    NOTICES. All notices or other communications hereunder shall be in writing and shall be deemed duly given if delivered to the Premises or if sent by certified or registered mail, return receipt requested, first-class, postage prepaid, (i) if to Landlord at such address as Landlord may designate from time to time, and (ii) if to Tenant, at the Premises, unless notice of a change of address is given pursuant to the provisions of this article. The day of notice shall be deemed to be the day following mailing.

SECTION 16.    MISCELLANEOUS.

16.1    *Successors and Assigns*. This Agreement shall be binding upon Tenant and its successors and assigns, and shall inure to the benefit of Landlord and its successors and assigns.

16.2    *Entire Agreement*. This Lease constitutes the entire understanding of the parties thereto with respect to the subject matter thereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

16.3    *Governing Law*. This Lease and the Guaranties, and the rights and duties of the parties hereto, shall be construed and determined in accordance with the internal laws of the State of Minnesota.

5

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the date first above written.

LANDLORD

A.C.S. OF KASSON LLC,
  a Minnesota limited liability company

By: _Brad A Clemens_
Name: _Brad A Clemens_
Its: _president_

TENANT

CREATIVE STARS ACADEMY, LLC

By: Creative Stars Academy, LLC
  Name: _Jill Mertens_
  Its:  Owner

7

**EXHIBIT A**
**SITE**

Exhibit A

## SCHEDULE A
### EXTENDED TERM(S)

Tenant hereby elects to exercise its option to extend the Lease commencing on _____
for an additional _____ (\_\_) year Term. "Rent" during this Extended Term shall be:

$_____ per Lease Year

Accepted this \_\_\_ day of _____, 20\_\_\_:

**LANDLORD**                                    **TENANT**

A.C.S. OF KASSON LLC,                   CREATIVE STARS ACADEMY, LLC
  a Minnesota limited liability company      a Minnesota limited liability company

By:_____          By:_____
  Name: _____          Name: _____
  Its: _____          Its: _____

---

Tenant hereby elects to exercise its option to extend the Lease commencing on _____
for an additional _____ (\_\_) year Term. "Rent" during this Extended Term shall be:

$_____ per Lease Year

Accepted this \_\_\_ day of _____, 20\_\_\_:

**LANDLORD**                                    **TENANT**

A.C.S. OF KASSON LLC,                   CREATIVE STARS ACADEMY, LLC,
  a Minnesota limited liability company      a Minnesota limited liability company

By:_____          By:_____
  Name: _____          Name: _____
  Its: _____          Its: _____

# Minnesota Department of Public Safety
## State Fire Marshal Division

# Permission for inspection

**Property owners permission for fire inspection**
**Department of Human Services (DHS) licensed or certified care programs**

When a fire code inspection is requested for a DHS licensed or certified license-exempt care program, written permission must first be obtained from the property owner.

I (print owner's name) _Dick Raimann_ certify that I own the building located at the following address and give my permission for a Deputy State Fire Marshal to inspect the building for compliance with the Minnesota State Fire Code.

Address: _P.O Box 8021_

City: _Rochester_ State: _MN_ Zip: _55903_

I am aware that _301 Mantorville Ave S Suite_ _Creative Stars_ _509 Kasson, MN 55944_ is requesting a fire code inspection at the above address for a proposed or existing care program regulated by the Minnesota Department of Human Services.

**By giving this permission, a Deputy State Fire Marshal may conduct an inspection of the entire building (or buildings) for compliance with the Minnesota State Fire Code. Notwithstanding the specific status of the DHS licensed or certified care program, you, as the property owner, will be responsible for the correction of any violations identified during the inspection based on the building's current occupancy use.**

> **EXCEPTION: For owner-occupied single-family homes corrective orders apply only to the licensed or certified care program.**

Owner's Signature: _DocuSigned by: Dick Raimann 86E17547442546B..._

Address (if different from above): _____

Phone Number: _507-251-4853_

Email: _Jay@Loamcommercicl.Com_ Date: _1-20-23_

 

Permission for inspection – DHS care programs – October 2019

**Minnesota Department of Public Safety
State Fire Marshal Division**

# Permission for inspection

## Property owners permission for fire inspection
## Department of Human Services (DHS) licensed or certified care programs

When a fire code inspection is requested for a DHS licensed or certified license-exempt care program, written permission must first be obtained from the property owner.

I (print owner's name) _Jay Christenson (manager)_ certify that I own the building located at the following address and give my permission for a Deputy State Fire Marshal to inspect the building for compliance with the Minnesota State Fire Code.

Address: _301 Mantorville Ave South_

City: _Kasson_     State: _MN_     Zip: _55944_

I am aware that _____ is requesting a fire code inspection at the above address for a proposed or existing care program regulated by the Minnesota Department of Human Services.

**By giving this permission, a Deputy State Fire Marshal may conduct an inspection of the entire building (or buildings) for compliance with the Minnesota State Fire Code. Notwithstanding the specific status of the DHS licensed or certified care program, you, as the property owner, will be responsible for the correction of any violations identified during the inspection based on the building's current occupancy use.**

Owner's Signature: _____ Manager

Address (if different from above): _P.O. Box 8021 Rochester MN 55903_

Phone Number: _507-251-4853_

Email: _Jay@loamcommercial.com_     Date: _1-16-23_

 

Permission for inspection – DHS care programs – Feb. 2018

LEASE

THIS LEASE is made and entered into effective October 1, 2022 (the "Effective Date"), by and between A.C.S. OF KASSON LLC, a Minnesota limited liability company ("Landlord"), and Creative Stars Academy and Learning Center, a Minnesota limited liability company ("Tenant"). For and in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto do hereby mutually agree as follows:

SECTION 1.      THE PREMISES, SITE, COMMON AREAS.

**1.1    *Premises.*** Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, for the term and upon the conditions hereinafter provided, the Day Care facility located at 301 Mantorville Avenue South, Unit/Suite 400, Kasson, MN 55944 (the "Premises").

**1.2    *Site.*** The Premises described together with the common areas and other appurtenances are depicted on Exhibit A (the "Site").

**1.3    *Common Areas.*** Tenant shall have the non-exclusive right to use in common with other tenants and/or occupants of the Site, the following areas appurtenant to the Premises: parking areas and facilities, roadways, sidewalks, walkways, parkways, plazas, driveways and landscaped areas and similar areas and facilities situated within the exterior areas of the Site and not otherwise designated for the exclusive or restricted use by Landlord and/or individual tenants of other buildings located within the Site (the "Common Areas"). All Common Areas shall be subject to Landlord's sole management and control and shall be operated and maintained in such manner as Landlord, in its reasonable discretion, shall determine.

SECTION 2.      TERM.

**2.1    *Initial Term.*** The initial term of this Lease shall commence on the Effective Date first set forth above and expires at midnight on the last day of the sixtieth (60th) full calendar month thereafter (the "Initial Term").

**2.2    *Extended Term.*** Notwithstanding the expiration of the Initial Term, so long as Tenant is not in default of its obligations under this Lease, Tenant has the option to extend the Term on all the provisions contained in this Lease, except for Base Rent (as hereinafter defined), for additional three (5) year periods (each, an "Extended Term") following the expiration of the Initial Term or the previous Extended Term (each, a "Previous Term"), by executing the applicable option agreement prior to the expiration of the Previous Term as provided on Schedule A attached hereto; provided that, (i) Landlord, in its sole discretion, shall determine the applicable Rent for each Extended Term, and (ii) Tenant's execution of the stated new Rent shall be evidenced by its signature on Schedule A attached hereto. If Tenant appropriately exercises its option to extend, the Extended Term will commence on the first day following the expiration of the Previous Term. As used herein the "Term" shall mean the Initial Term and any Extended Term, as applicable.

SECTION 3.      RENT.

**3.1    *Base Rent.*** For purposes hereof, a "Lease Year" commences on October 1,2022 and terminates at the end of the sixtieth (60th) month following thereafter. During the first Lease term (commencing October 1, 2022 and ending September 30, 2027), Tenant shall pay as "Base Rent" for the Premises per the following schedule:

EXHIBIT C

Months 1,2,3 (October 2022, November 2022, December 2022).  30% rent $2040 plus full Operating cost.
Months 4,5,6,(January 2023, February 2023, March 2023).  50% rent $3400 plus full Operating cost.
Months 7,8,9 (April 2023, May 2023, June 2023).  80% rent $5440 plus full Operating cost.
Months 10-60 (July 2023 through September 2027).  100% rent $6800 plus full Operating cost.

During each Extended Term, the Base Rent shall be agreed upon by Landlord and Tenant and set forth on Schedule A attached hereto.

   **3.2**    *Additional Rent.*  As additional consideration for this Lease, Tenant shall, for the Term of this Lease, and without any set-off or deduction therefrom, pay directly, before delinquency, the following ("Additional Rent" and together with Base Rent, collectively referred to herein as "Rent"):

      (a) *Operating Costs.*  Tenant shall pay all costs of maintaining and operating the Premises, and Landlord's costs of owning the Premises and its Pro Rata Share of Common Area Expenses. Said costs shall be referred to herein as "Operating Costs" and are hereby defined to include but not be limited to, all real estate taxes and assessments on the Premises, heat, cooling, utilities, insurance, security, all taxes and other governmental impositions, including but not limited to gross receipts taxes and taxes on rentals relating to the Premises, all maintenance and repair expenses, whether or not said maintenance or repair expenses may be capitalized for federal income tax purposes, any equipment rental and any and all other costs of operation, whether ordinary or extraordinary, all costs to supervise and administer the Site and the Common Areas, including wages and benefits payable to employees of Landlord whose duties are directly, but only to such extent, connected with the operation and maintenance of the Site, and such management fees as may be paid to the property manager (which may be an entity related to Landlord).

      "Common Area Expenses" means all costs to operate, maintain, repair, replace, supervise, insure and administer the Common Areas, including supplies, materials, labor and equipment used in or related to the operation and maintenance of the Common Areas, including parking areas (including, without limitation, all costs of resurfacing and restriping parking areas), signs and directories on the Site, landscaping (including maintenance contracts and fees payable to landscaping consultants), amenities, sprinkler systems, sidewalks, walkways, driveways, curbs, lighting systems and security services, if any, provided by Landlord for the Common Areas.

      Tenant's "Pro Rata Share" is 19%. Year 1 ending September 30, 2022 will be capped at a Maximum price of $3.50/SF

      The "Rentable Area" of the Premises is 6800 square feet.

      (b)    *Taxes.*  Notwithstanding the foregoing provisions of this Section 3.2, Landlord shall submit to the Dodge County Auditor/Treasurer's office any real estate and assessment payment for the Site.  On a monthly basis, on the first day of each and every calendar month during the Term hereof, Tenant shall pay to Landlord $1,983.00 of Tenant's Pro Rata Share of the real estate taxes, special assessments and any other taxes that may be imposed in lieu of or partially in lieu of general real estate taxes applicable to the Site.  Tenant shall pay such taxes and assessments to Landlord based upon the earliest available estimate of annual real estate taxes and assessments from the Dodge County office of property records and licensing.  In the event such estimated payments create a surplus or overage, Landlord shall retain such overage and shall apply all amounts therefrom against later accruing taxes and assessments.

      (c)    *Insurance.*  Notwithstanding the forgoing provisions of this Section 3.2, Landlord

2

shall pay for the insurance for the Premises. On a monthly basis, on the first day of each and every calendar month during the Term hereof, Tenant shall pay to Landlord $0 (included above) of Tenant's Pro Rata Share of the insurance for the Site.

**3.3     *Rent Net of All Costs.*** It is the purpose and intent of Landlord and Tenant that Base Rent payable by Tenant hereunder shall be absolutely net to Landlord, so that this Lease shall yield, net to Landlord, Base Rent in each year during the Term, and that all costs, fees, expenses, interest (other than mortgage interest, if any), charges, reimbursements and obligations of every kind and nature whatsoever relating to the Premises (except those expressly stated in this Lease to be obligations of Landlord, if any), which may arise or become due during the Term shall be paid or discharged by Tenant as Additional Rent hereunder, whether or not specifically designated as such, and Tenant agrees to indemnify and hold Landlord harmless from and against such costs, fees, interest, charges, expenses, reimbursements and obligations, and interest thereon.

**3.4     *Manner of Payment.*** Rent shall be payable in monthly installments (or more frequently as Landlord and Tenant may mutually agree) on or before the last day of each Lease month. Tenant will pay Rent, together with all other amounts due hereunder, to Landlord at such address as Landlord may designate from time-to-time, without demand and without deduction, setoff or counterclaim.

**SECTION 4.     USE.**  Tenant shall use the Premises as an Daycare facility and Learning Center. Tenant shall not convert the Premises to an alternative use during the Term. Tenant will not use or occupy the Premises for any unlawful purpose, and will comply with all present and future laws, ordinances, regulations and orders of the United States of America, the State of Minnesota and all other governmental units having jurisdiction over the Premises.

**SECTION 5.     INDEMNITY.**  Landlord (including Landlord's agents, successors and assigns) shall not be liable to Tenant, or those claiming through or under Tenant, for any injury, death or property damage occurring in, on or about the Premises, and Tenant shall indemnify Landlord and hold Landlord harmless from any claim or damage arising out of any injury, death or property damage occurring in, on or about the Premises to Tenant or to any employee, customer or invitee of Tenant except for liability arising out of the negligence of Landlord or Landlord's agent.

**SECTION 6.     ASSIGNMENT AND SUBLETTING.**

**6.1     *Tenant Assignments and Subletting.*** Tenant will not assign, transfer, mortgage or encumber this Lease or sublet or rent or permit occupancy or use of the Premises, or any part thereof by any third party, without obtaining the prior written consent of Landlord.

**6.2     *Landlord's Right to Sell or Assign.*** Landlord shall have the right to sell or convey the Premises subject to this Lease or to assign its right, title and interest as Landlord under this Lease in whole or in part. In the event of any such sale or assignment other than a security assignment, Landlord shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Landlord contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

**SECTION 7.     REPAIRS AND MAINTENANCE.**  Tenant at its sole cost will keep the Premises in good, clean, safe and sanitary condition, will take good care thereof, will suffer no waste or injury thereto, and will, at the expiration or other termination of the term of this Lease, surrender the same empty, cleaned and in the same order and condition in which they are on the Effective Date. Tenant at its sole cost shall make all necessary repairs to the Premises, window panes, including plate glass, if any, and including repairs to and, if Landlord deems it reasonably necessary prior to the end of the Term, replacement of the roof.

3

Landlord will make all necessary repairs to the structural components of the Premises. Landlord shall pay all expenses for maintaining, repairing, and if necessary, replacing the plumbing, sewage, heating, air conditioning, electrical and ventilating systems in order to maintain said systems in good repair.

**SECTION 8.   RIGHT OF ENTRY.** Tenant will permit Landlord, or Landlord's agent or representative, to enter the Premises to examine, inspect and protect the same, and to make such alterations and/or repairs as in the judgment of Landlord may be deemed necessary for the Premises, or to exhibit the same to prospective tenants.

**SECTION 9.   INSURANCE RATING.** Tenant will not conduct or permit to be conducted any activity, or place any equipment in or about the Premises, which will in any way increase the rate of fire insurance or other insurance on the Premises.

**SECTION 10.   SERVICES AND UTILITIES.** For the entire term of this Lease, and to the extent such services are separately provided to the Premises, Tenant shall make all arrangements, and shall pay directly before delinquency, for all utilities and services furnished to or used by it, including, without limitation, gas, electricity, water, sewer, telephone service, and trash collection and for all connection charges.

**SECTION 12.   FIRE AND CASUALTY.** If, during the Term of this Lease, the Premises or the building in which the Premises are located are totally or partially destroyed, rendering the Premises totally or partially inaccessible or unusable, Landlord shall, in Landlord's sole judgment, determine whether to repair, replace, or restore said Premises or the building in which the Premises are located, or terminate this Lease. Landlord shall provide Tenant with notice of Landlord's determination to restore the Premises or the building in which the Premises are located or to terminate the Lease within thirty (30) days of the total or partial destruction of the Premises or the building in which the Premises are located. If the Premises or the building in which the Premises are located are totally destroyed and Landlord elects to restore the Premises, then this Lease shall not terminate, but Tenant shall be entitled to a total abatement of rent during said period of restoration. If Landlord fails to substantially complete restoration within one hundred eighty (180) days after the Premises or the building in which the Premises are located are totally destroyed, Tenant may, at Tenant's option upon thirty (30) days written notice to Landlord, terminate this Lease. If the Premises or the building in which the Premises are located is partially destroyed or damaged, and if Landlord has elected to repair the Premises, then this Lease shall not terminate, and Tenant shall remain responsible for rent hereunder, except that said rent shall be reduced based upon the extent to which the damage or destruction interferes with Tenant's use of the Premises, until such time as Landlord has completed repairs to the Premises or the building in which the Premises are located.

**SECTION 12.   DEFAULT AND REMEDIES.**

**12.1   *Defaults.*** Each of the following shall be deemed a breach of this Lease and a default by Tenant: (a) Tenant shall fail to pay any monthly installment of Rent; (b) Tenant shall fail to pay when due any amounts owing to Landlord by Tenant, whether or not such obligation arises under this Lease; (c) Tenant becomes insolvent, performs any act of bankruptcy or is not generally paying its debts within reasonably accepted business standards; and (d) Tenant shall violate or fail to perform any of the conditions, covenants, or agreements herein made by Tenant, or shall violate or fail to obey any reasonable rules from time to time promulgated by Landlord if not cured within thirty (30) days after written notice thereof is given by Landlord.

**12.2   *Remedies.*** (a)   In the event of any breach or default, and without any notice, except, if applicable, such notice as may be required by law and cannot be waived by Tenant (all other notices being hereby waived), Landlord shall be entitled to exercise, at Landlord's option, concurrently, successively or in any combination, all remedies available at law or in equity, including without limitation any one or more

4

of the following: (i) Landlord may terminate this Lease; (ii) Landlord may reenter and take possession of the Premises or any part thereof (which reentry shall not operate to terminate this Lease unless Landlord expressly so elects), after appropriate legal process; (iii) Landlord may relet the Premises or any part thereof for such term or terms (including a term which extends beyond the original term of this Lease), at such rentals and upon such other terms as Landlord, in Landlord's sole discretion, may determine, with all proceeds received from such reletting being applied to the rentals and other sums due from Tenant in such order as Landlord may, in its sole discretion, determine, with Tenant remaining liable for any deficiency; (iv) Landlord may accelerate and recover from Tenant an amount equal to Rent to be received from Tenant under this Lease from the date of such breach to the expiration of the then-current term; and/or (v) Landlord may recover from Tenant all expenses, including attorneys' fees, marketing expenses and leasing commissions, and cost of alterations occasioned by a breach by Tenant of this Lease, reasonably paid or incurred by Landlord as a result of such breach.

(b)     In addition, in the event of any breach or default by Tenant, Landlord may, but shall not be obligated to, immediately or at any time thereafter, and without notice, except as required herein, correct such breach or default without, however, curing the same for the account and at the expense of Tenant.

(c)     The commencement and prosecution of one action shall not be deemed a waiver from commencing one or more actions from time to time in the future. All rights and remedies of Landlord under this Lease shall be cumulative and shall not be exclusive of any other rights and remedies provided to Landlord under applicable law.

SECTION 13.   WAIVER. No waiver by Landlord of any breach of any covenant, condition or agreement herein contained shall operate as a waiver of such covenant, condition or agreement itself, or of any subsequent breach thereof.

SECTION 14.   COVENANTS OF LANDLORD. If Tenant shall pay the rental and perform all of the covenants, terms and conditions of this Lease to be performed by Tenant, Tenant shall, during the term hereby created, freely, peaceably and quietly occupy and enjoy the full possession of the Premises without molestation or hindrance by Landlord or any party claiming through or under Landlord.

SECTION 15.   NOTICES. All notices or other communications hereunder shall be in writing and shall be deemed duly given if delivered to the Premises or if sent by certified or registered mail, return receipt requested, first-class, postage prepaid, (i) if to Landlord at such address as Landlord may designate from time to time, and (ii) if to Tenant, at the Premises, unless notice of a change of address is given pursuant to the provisions of this article. The day of notice shall be deemed to be the day following mailing.

SECTION 16.   MISCELLANEOUS.

16.1   *Successors and Assigns.* This Agreement shall be binding upon Tenant and its successors and assigns, and shall inure to the benefit of Landlord and its successors and assigns.

16.2   *Entire Agreement.* This Lease constitutes the entire understanding of the parties thereto with respect to the subject matter thereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

16.3   *Governing Law.* This Lease and the Guaranties, and the rights and duties of the parties hereto, shall be construed and determined in accordance with the internal laws of the State of Minnesota.

5

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the date first above written.

LANDLORD

TENANT

A.C.S. OF KASSON LLC,
 a Minnesota limited liability company

CREATIVE STARS ACADEMY, LLC

By: _BAC_____
Name: Brad A Clemens
Its: president

By: Creative Stars Academy, LLC
 Name: Jill Mertens
 Its: Owner

7

**EXHIBIT A**
**SITE**

Exhibit A

## SCHEDULE A
### EXTENDED TERM(S)

---

Tenant hereby elects to exercise its option to extend the Lease commencing on _____
for an additional _____ (__) year Term. "Rent" during this Extended Term shall be:

     $_____ per Lease Year

Accepted this ___ day of _____, 20___ :

**LANDLORD**                                    **TENANT**

A.C.S. OF KASSON LLC,                           CREATIVE STARS ACADEMY, LLC
  a Minnesota limited liability company        a Minnesota limited liability company

By:_____              By:_____
  Name: _____         Name: _____
  Its: _____        Its: _____

---

Tenant hereby elects to exercise its option to extend the Lease commencing on _____
for an additional _____ (__) year Term. "Rent" during this Extended Term shall be:

     $_____ per Lease Year

Accepted this ___ day of _____, 20___ :

**LANDLORD**                                    **TENANT**

A.C.S. OF KASSON LLC,                           CREATIVE STARS ACADEMY, LLC,
  a Minnesota limited liability company        a Minnesota limited liability company

By:_____              By:_____
  Name: _____         Name: _____
  Its: _____        Its: _____

---

Schedule A

# Minnesota Department of Public Safety
## State Fire Marshal Division

# Permission for inspection

**Property owners permission for fire inspection**
**Department of Human Services (DHS) licensed or certified care programs**

When a fire code inspection is requested for a DHS licensed or certified license-exempt care program, written permission must first be obtained from the property owner.

I (print owner's name) _Dick Raimann_ certify that I own the building located at the following address and give my permission for a Deputy State Fire Marshal to inspect the building for compliance with the Minnesota State Fire Code.

Address: _P.O Box 8021_

City: _Rochester_  State: _MN_  Zip: _55903_

Creative Stars

I am aware that _301 Mantorville Ave S Suite 509 Kasson, MN 55944_ is requesting a fire code inspection at the above address for a proposed or existing care program regulated by the Minnesota Department of Human Services.

**By giving this permission, a Deputy State Fire Marshal may conduct an inspection of the entire building (or buildings) for compliance with the Minnesota State Fire Code. Notwithstanding the specific status of the DHS licensed or certified care program, you, as the property owner, will be responsible for the correction of any violations identified during the inspection based on the building's current occupancy use.**

> **EXCEPTION: For owner-occupied single-family homes corrective orders apply only to the licensed or certified care program.**

DocuSigned by:

Owner's Signature: _Dick Raimann_
96E17547442546B...

Address (if different from above): _____

Phone Number: _507-251-4853_

Email: _Jay@Loamcommercial.com_  Date: _1-20-23_



Permission for inspection – DHS care programs – October 2019

# Minnesota Department of Public Safety
## State Fire Marshal Division

# Permission for inspection

## Property owners permission for fire inspection
## Department of Human Services (DHS) licensed or certified care programs

When a fire code inspection is requested for a DHS licensed or certified license-exempt care program, written permission must first be obtained from the property owner.

I (print owner's name) _Jay Christenson (manager)_ certify that I own the building located at the following address and give my permission for a Deputy State Fire Marshal to inspect the building for compliance with the Minnesota State Fire Code.

Address: _301 Mantorville Ave South_

City: _Kasson_     State: _MN_     Zip: _55944_

I am aware that _____ is requesting a fire code inspection at the above address for a proposed or existing care program regulated by the Minnesota Department of Human Services.

**By giving this permission, a Deputy State Fire Marshal may conduct an inspection of the entire building (or buildings) for compliance with the Minnesota State Fire Code. Notwithstanding the specific status of the DHS licensed or certified care program, you, as the property owner, will be responsible for the correction of any violations identified during the inspection based on the building's current occupancy use.**

Owner's Signature: _[signature]_  Manager

Address (if different from above): _P.O. Box 8021 Rochester MN 55903_

Phone Number: _507-251-4853_

Email: _Jay@loamcommercial.com_     Date: _1-16-23_



Permission for inspection – DHS care programs – Feb. 2018

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA**

In re:   Creative Stars Academy, LLC,

Case No. 25-33151

Chapter 7

Debtor.

# MEMORANDUM OF LAW IN SUPPORT
# MOTION FOR
# RELIEF FROM AUTOMATIC STAY

## INTRODUCTION

Raimann Farms, LLC ("Movant" or "Landlord") submits this Memorandum of Law in support of its Motion for Relief from the Automatic Stay pursuant to 11 U.S.C. § 362(d). Movant seeks modification of the automatic stay for the limited purpose of commencing and prosecuting an eviction action against Creative Stars Academy, LLC ("Debtor") in the appropriate state court in Dodge County, Minnesota, to recover possession of commercial premises located at 301 Mantorville Avenue South, Unit/Suite 400, Kasson, MN 55944 (the "Premises").

## STATEMENT OF FACTS

Movant is the landlord under a commercial lease for the Premises. On or about September 8, 2022, A.C.S. of Kasson LLC assigned all of its rights, title, and interest as landlord under the Lease to Movant pursuant to an Assignment of Leases. The Lease, effective October 1, 2022, was originally between A.C.S. of Kasson LLC and Creative Stars Academy and Learning Center for the operation of a daycare facility and learning center.

Under the Lease, the Debtor is required to pay monthly Base Rent of $6,800.00 plus Operating Costs, including a monthly real estate tax contribution of $1,983.00 and its 19% Pro Rata Share of Common Area Expenses. The Lease is structured as a net lease, meaning the Base

Rent is intended to be absolutely net to the Landlord, with the Tenant bearing all costs of maintaining and operating the Premises.

The Debtor filed a voluntary petition under Chapter 11, Subchapter V of the Bankruptcy Code in this Court, Case No. 25-33151. On February 5, 2026, this Court entered an Order Converting the case to Chapter 7, finding that: (a) the Debtor had ceased all business activities and would not propose a plan of reorganization; (b) the Debtor failed to pay post-petition taxes; (c) the Debtor failed to file monthly reports after November 2025; (d) the estate had suffered substantial loss and diminution; and (e) the Debtor was no longer pursuing rehabilitation.

The Court's Order further noted that the Debtor reported having no remaining cash, had overdrawn its accounts, had unpaid post-petition rents of $15,500, unpaid post-petition payroll of $6,200, and post-petition professional fees exceeding $10,000.

The Debtor owes rent for February 2026. Post-petition rent continues to accrue at a rate of at least $8,783.00 per month (consisting of $6,800.00 in base rent and $1,983.00 in monthly taxes). The Debtor has ceased all operations and is no longer utilizing the Premises.

Notwithstanding the Debtor's cessation of operations and the conversion of this case to Chapter 7, upon information and belief, the principal of the Debtor has formed a new entity post-petition and is currently operating a childcare center through that new entity. Thus, while the Debtor remains in possession of the Premises without paying rent, the Debtor's principal appears to have simply shifted the same or substantially similar business operations to a newly created entity—effectively continuing the business while leaving the Debtor's creditors, including Movant, unpaid. The creation of this new entity post-petition, while the Debtor's obligations under the Lease remain outstanding, raises serious concerns regarding the good faith of the Debtor and its principal.

**ARGUMENT**

**I. THE STANDARD FOR RELIEF FROM THE AUTOMATIC STAY**

Section 362(d) of the Bankruptcy Code provides two independent grounds for modifying the automatic stay. Under Section 362(d)(1), the Court shall grant relief "for cause, including the lack of adequate protection of an interest in property." Under Section 362(d)(2), the Court shall grant relief where "the debtor does not have an equity in such property" and "such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d). Either ground independently supports stay relief here.

**II. CAUSE EXISTS UNDER § 362(d)(1)**

The failure to pay post-petition rent is well-established cause for relief from the automatic stay. CitiMortgage, Inc. v. Borm (In re Borm), 508 B.R. 104 (B.A.P. 8th Cir. 2014). A debtor's obligation to pay post-petition rent as it comes due is a fundamental aspect of the debtor's duty to protect a landlord's interests in the property.

Here, multiple factors establish cause for stay relief:

**Nonpayment of Post-Petition Rent.** The Debtor owes rent for February 2026. The post-petition rental arrearage is growing monthly at a rate of at least $8,783.00. This Court's own Order Converting the case to Chapter 7 acknowledged that unpaid post-petition rents totaled $15,500 as of the Debtor's last report. The Movant is suffering ongoing, uncompensated losses as the Debtor continues to occupy the Premises without payment.

**Cessation of Business Operations.** The Debtor has ceased all business activities, as acknowledged in the Court's Order Converting to Chapter 7. The Debtor is not operating at the Premises and will not resume operations. There is no prospect of the Debtor curing the rental default or resuming rent payments.

**No Adequate Protection.** The Debtor has no remaining cash and has overdrawn its accounts. There is no mechanism by which the Movant's interest in the Premises can be adequately protected while the stay remains in effect. Each passing month increases the Movant's losses without any corresponding benefit to the estate or its creditors.

**Bad Faith and Post-Petition Conduct of the Debtor's Principal.** The totality of the circumstances further supports a finding of cause under § 362(d)(1) in light of the conduct of the Debtor's principal. Upon information and belief, the Debtor's principal has formed a new entity post-petition and is currently operating a childcare center through that new entity. This conduct strongly suggests that the Debtor's cessation of operations was not the result of genuine financial distress but rather a strategic decision to shed obligations while continuing the same or substantially similar business under a different corporate identity. Courts in the Eighth Circuit have recognized that a debtor's bad faith, including the use of bankruptcy to gain an unfair advantage over creditors, constitutes cause for relief from the stay. *See In re Laguna Assocs. Ltd. P'ship*, 30 F.3d 734, 737 (6th Cir. 1994) (bad faith of debtor is a recognized basis for cause under § 362(d)(1)); *see also In re Holtkamp*, 669 F.2d 505, 508 (7th Cir. 1982) (noting that the automatic stay is not intended to be used as a shield to facilitate abuse of the bankruptcy process).

The creation of a new childcare entity by the Debtor's principal while the Debtor remains in bankruptcy with mounting unpaid obligations to the Movant is precisely the type of conduct that warrants lifting the automatic stay. The principal's actions suggest an attempt to enjoy the benefits of continued business operations while using the Debtor's bankruptcy filing as a shield against the legitimate claims of creditors. Where, as here, the debtor's principal creates a successor entity to continue the same line of business while leaving creditors of the original entity unpaid, courts have found such conduct to be indicative of bad faith and a basis for stay relief. *See In re*

*Cedar Shore Resort, Inc.*, 235 F.3d 375, 380 (8th Cir. 2000) (analyzing bad faith in the context of the debtor's conduct and intent); *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994) (examining whether the debtor sought to abuse the protections of the Bankruptcy Code). This Court should not permit the automatic stay to serve as a tool enabling the Debtor's principal to evade the Debtor's contractual obligations to Movant.

### III. RELIEF IS WARRANTED UNDER § 362(d)(2)

Relief from the automatic stay is also appropriate under 11 U.S.C. § 362(d)(2). Under this provision, the Court "shall" grant relief where the debtor has no equity in the property and the property is not necessary to an effective reorganization. Both conditions are satisfied here.

First, the Debtor holds no equity interest in the Premises; it is a tenant under a commercial lease. The Debtor's leasehold interest, if any, has no value given the outstanding defaults and cessation of operations.

Second, the Premises are not necessary to an effective reorganization because there is no reorganization to effectuate. This case has been converted to Chapter 7 for liquidation. The Supreme Court has held that the requirement of § 362(d)(2)(B)—that the property be "necessary to an effective reorganization"—means that "there must be a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988) (resolving split among circuits including the Eighth Circuit's position in *In re Briggs Transp. Co.*). In a Chapter 7 case, there is by definition no possibility of reorganization. *See Norwest Bank Worthington v. Ahlers (In re Ahlers)*, 794 F.2d 388 (8th Cir. 1986), *rev'd on other grounds*, 485 U.S. 197 (1988) (granting stay relief where reorganization was not feasible); *see also In re Brook Valley VII, J.V.*, 496 F.3d 892, 899 (8th Cir. 2007) (discussing the relationship between stay relief and property of the estate).

### IV. THE BALANCE OF EQUITIES FAVORS RELIEF

The balance of equities strongly favors granting the requested relief. Movant is suffering ongoing financial harm from the Debtor's non-payment of rent, while the estate derives no benefit from the continued stay of eviction proceedings. The Debtor has ceased operations, has no assets, and the case has been converted to Chapter 7 for liquidation. Permitting Movant to pursue its state law eviction remedies will not prejudice the estate or any other creditor. Conversely, continued enforcement of the stay serves only to deprive Movant of its state law remedies while increasing its losses.

The equitable considerations are further amplified by the conduct of the Debtor's principal. While the Movant is unable to pursue its state law remedies due to the automatic stay, the Debtor's principal has established a new entity and continues to operate a childcare center—the same type of business previously operated by the Debtor. The inequity of this situation is manifest: the Debtor's principal benefits from the fresh start afforded by a new entity while the Movant remains bound by the automatic stay and unable to recover possession of the Premises or mitigate its losses. The automatic stay was never intended to produce this inequitable result. *See In re Dixie Broad. Inc.*, 871 F.2d 1023, 1026 (11th Cir. 1989) (noting that the automatic stay is designed to protect the debtor and its creditors, not to be used as a sword against creditors).

### V. THE COURT SHOULD WAIVE THE FOURTEEN-DAY STAY PERIOD

Fed. R. Bankr. P. 4001(a)(3) provides that an order granting a motion for relief from the automatic stay is stayed for fourteen days unless the court orders otherwise. Given the Debtor's complete cessation of business, lack of any remaining assets, and the continuing accrual of unpaid rent, Movant respectfully requests that the Court waive the fourteen-day stay period to permit immediate commencement of eviction proceedings.

**CONCLUSION**

For the foregoing reasons, Movant Raimann Farms, LLC respectfully requests that this Court grant its Motion for Relief from the Automatic Stay and enter an order: (a) granting Movant relief from the automatic stay to pursue an eviction action in state court; (b) permitting Movant to exercise all rights and remedies available under the Lease and applicable state law; (c) waiving the fourteen-day stay of Fed. R. Bankr. P. 4001(a)(3); and (d) granting such other and further relief as the Court deems just and equitable.

Dated: February 17, 2026

DUNLAP & SEEGER, P.A.

By: s/ Benjamin S. King
　　 Benjamin S. King
　　 Attorney License No. 0395466
Attorneys for Raimann Farms, LLC
30 Third Street SE, Suite 400
Post Office Box 549
Rochester, Minnesota 55903
Telephone No. (507) 288-9111

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MINNESOTA**

---

In re:   Creative Stars Academy, LLC,

Debtor.

Case No. 25-33151

Chapter 7

---

**AFFIDAVIT IN SUPPORT OF**
**MOTION FOR**
**RELIEF FROM AUTOMATIC STAY**

---

**AFFIDAVIT IN SUPPORT OF**
**MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

STATE OF MINNESOTA            )
                              ) ss.
COUNTY OF FARIBAULT           )

I, Richard Raimann, being first duly sworn upon oath, depose and state as follows:

1.      I am President of Raimann Farms, LLC ("Movant"). I am authorized to make this Affidavit on behalf of Movant. I have personal knowledge of the facts set forth herein and am competent to testify thereto.

2.      Raimann Farms, LLC is the landlord under a commercial lease (the "Lease") with Creative Stars Academy, LLC ("Debtor") for commercial premises located at 301 Mantorville Avenue South, Unit/Suite 400, Kasson, MN 55944 (the "Premises").

3.      On or about September 8, 2022, A.C.S. of Kasson LLC assigned all of its rights, title, and interest as landlord under the Lease to Raimann Farms, LLC pursuant to an Assignment of Leases. A true and correct copy of the Assignment of Leases is attached to the Motion as Exhibit B.

4.      A true and correct copy of the Lease, effective October 1, 2022, is attached to the Motion as Exhibit C.

5.      Under the Lease, the Debtor is obligated to pay monthly Base Rent of $6,800.00, a monthly real estate tax contribution of $1,983.00, and its Pro Rata Share (19%) of Common Area Expenses and other Operating Costs.

6.      As of the date of this Affidavit, the Debtor is in arrears on its rental obligations. The monthly rental obligation, including base rent and the monthly tax payment alone, totals at least $8,783.00 per month. The Debtor owes at least $9,912.05 in unpaid rent for the month of February 2026, with the arrearage continuing to grow.

7.      To my knowledge, the Debtor has ceased all business operations at the Premises. The Debtor is no longer operating a daycare facility and learning center, which was the sole permitted use under the Lease. The principal of Debtor, Jill Mertens, is still occupying the space and may still be operating a childcare center under a different legal entity "Creative Stars Academy Childcare and Learning Center II LLC."

8.      I am aware that on February 5, 2026, the United States Bankruptcy Court for the District of Minnesota entered an Order Converting the Debtor's case from Chapter 11, Subchapter V to Chapter 7. The Court found that the Debtor had ceased all business activities, failed to pay post-petition taxes, and failed to file monthly reports.

9.      Raimann Farms, LLC continues to incur ongoing expenses related to the Premises, including but not limited to real estate taxes, insurance, and maintenance costs, without receiving any rental income from the Debtor.

10.     The Debtor has not communicated any intent or ability to cure the rental default or to resume rent payments.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MINNESOTA**

In re:   Creative Stars Academy, LLC,

Case No. 25-33151

Chapter 7

Debtor.

**ORDER GRANTING MOTION FOR**
**RELIEF FROM AUTOMATIC STAY**

**ORDER GRANTING MOTION FOR**
**RELIEF FROM THE AUTOMATIC STAY**

This matter came before the Court on the Motion for Relief from the Automatic Stay (the "Motion") filed by Raimann Farms, LLC ("Movant"). The Court, having reviewed the Motion, the Memorandum of Law in Support, the Affidavit of [Name of Affiant], and any responses or objections filed, and being otherwise fully informed in the premises, finds that:

1.     Movant is the landlord under a commercial lease with Creative Stars Academy, LLC ("Debtor") for premises located at 301 Mantorville Avenue South, Unit/Suite 400, Kasson, MN 55944.

2.     The Debtor has failed to pay post-petition for February 2026.

3.     This case was converted from Chapter 11, Subchapter V to Chapter 7 by Order of this Court dated February 5, 2026.

4.     The Debtor has ceased all business operations and has no remaining assets.

5.     Upon information and belief, the principal of the Debtor has formed a new entity post-petition and is currently operating a childcare center through that new entity, while the Debtor's obligations under the Lease remain outstanding and unpaid.

6. Cause exists under 11 U.S.C. § 362(d)(1) for relief from the automatic stay, including the Debtor's failure to pay post-petition rent, the lack of adequate protection of Movant's interest, and the conduct of the Debtor's principal in forming a new entity to continue operating the same type of business post-petition while leaving the Debtor's creditors unpaid.

7. Relief is also warranted under 11 U.S.C. § 362(d)(2) because the Debtor has no equity in the leasehold and the property is not necessary to an effective reorganization, as the case has been converted to Chapter 7.

Based on the foregoing, **IT IS HEREBY ORDERED:**

**A.** **The Motion is GRANTED.**

B. The automatic stay imposed by 11 U.S.C. § 362(a) is hereby modified and lifted to permit Movant, Raimann Farms, LLC, to commence and prosecute an eviction action against the Debtor, Creative Stars Academy, LLC, in the appropriate state court in Dodge County, Minnesota, to recover possession of the premises located at 301 Mantorville Avenue South, Unit/Suite 400, Kasson, MN 55944.

C. Movant is authorized to exercise all rights and remedies available to it under the Lease and applicable state law, including but not limited to termination of the Lease and recovery of possession of the Premises.

D. Nothing in the automatic stay shall be construed to protect or benefit any successor entity formed by the Debtor's principal or any entity operating a childcare center or similar business at or from the Premises. To the extent any such successor entity claims any right of possession or occupancy of the Premises, Movant is authorized to take all actions necessary to recover possession from such entity.

E.      Nothing in this Order shall be construed as a determination of the validity, priority, or extent of any claim or lien, or as a waiver of any claims the estate may have against Movant or any other party.

F.      The fourteen (14) day stay provided by Fed. R. Bankr. P. 4001(a)(3) is hereby waived, and this Order shall be effective immediately upon entry.

Dated:

_____
Mychal A. Bruggeman
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA**

---

In re:   Creative Stars Academy, LLC,

Case No. 25-33151

Chapter 7

Debtor.

---

## UNSWORN CERTIFICAT OF SERVICE

---

I, Cheyenne A. Sanborn, employed by Dunlap & Seeger, P.A., attorneys licensed to

practice law in this Court, with office address at 30 3rd Street Southeast, Suite 400, P.O. Box 549,

Rochester, Minnesota 55903-0549, declare under penalty of perjury that on February 17, 2026, I

served the following:

1.   NOTICE OF HEARING AND MOTION FOR RELIEF FROM AUTOMATIC STAY;
2.   MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RELIEF FROM
     AUTOMATIC STAY;
3.   AFFIDAVIT IN SUPPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY; and
4.   [PROPOSED] ORDER GRANTING MOTION FOR RELIEF FROM AUTOMATIC
STAY.

to each person referenced below, by enclosing a copy thereof in an envelope with first class mail

postage prepaid and depositing the same in the post office at Rochester, Minnesota, addressed to

each of them as follows:


Creative Stars Academy, LLC
301 Mantorville Avenue South
Suite 500
Kasson, MN 55944

And, I declare, under penalty of perjury, that the foregoing is true and correct.

Dated:  February 17, 2026

s/ Cheyenne A. Sanborn
Cheyenne A. Sanborn